Romberg, by Guardian *ad litem,* Plaintiff and Respondent, v. Nelson and others, Defendants: Hamm and another, Defendants and Appellants.*

*September 11—October 6, 1959.*

---

\* Motion for rehearing denied, without costs, on December 1, 1959.

For the appellants there were briefs by *Crocker, Herrick, Sigl & Goethel* of Eau Claire, and oral argument by *Kenneth L. Sigl.*

For the respondent there was a brief and oral argument by *Frank L. Morrow* of Eau Claire.

MARTIN, C. J. The accident occurred on September 24, 1957, on County Trunk Highway J, a north-south, three-lane highway in Chippewa county, at a point approximately 1,100 feet south of the intersection with Highway 53. Both cars were proceeding south, the Nelson car following the Hamm car. The time was about 12:45 noon; the weather was clear; the road was dry and level.

Miss Hamm is the daughter of the operator of Hamm's Cheese House, which is located on the east side of Highway J, almost immediately opposite the point of collision. She had traveled on Highway 53 and turned south on J, intending to make a left turn into the Cheese House driveway. Her testimony was that she was driving 30 miles per hour on Highway J, occupying the west lane of travel until her car was 150 feet from the place of collision, when she turned on her directional signal, looked into the rear-view mirror, and saw the Nelson car following in the west lane about 200 feet behind at a speed which she estimated at 75 miles per hour. She then turned into the center lane and made a second observation to the rear, at which time she saw the Nelson car in the center lane, 75 to 100 feet behind and "angling off to the left." She decided not to continue her left turn but to go straight down the center lane and within seconds the Nelson car collided with the rear of her car.

Donald Nelson testified he was a resident of Eau Claire; that on the day in question he drove his wife's automobile, with the plaintiff Romberg as a guest, to Cadott and Chippewa Falls in search of employment. After leaving Chippewa Falls they traveled along Highway 53 and on County Trunk J at a general speed of 60 to 65 miles per hour. Traveling south on J, Nelson observed the Hamm car about 200 feet ahead in the right-hand (west) lane. He was overtaking it, so pulled into the center lane to pass. There were no other cars in the vicinity. He testified he sounded his horn twice before the Hamm car moved from the outside lane. The

signal light appeared on the Hamm car as it left the west lane and entered the center lane; Nelson was then an estimated 55 feet behind and traveling at 65 miles per hour. At the same time he saw the Hamm car turn, his guest, Romberg, exclaimed, "Look out, she is turning." Nelson stepped on the brakes and turned his car to the right in an effort to avoid striking the Hamm car but there was too little distance between them and he struck the left rear of the Hamm car.

Romberg, the plaintiff, testified that he was seated in the right front seat of the Nelson car; that at no time did Nelson appear to have any difficulty in the operation of the car; that the general rate of speed was 55 to 60 miles per hour. He testified that when he first saw the Hamm car ahead it was in the west lane, Nelson was in the center lane and overtaking the Hamm car. Nelson sounded his horn; there was no visible signal that the Hamm car might change its position on the highway. When the Hamm car turned into the center lane he cried out, as testified to by Nelson.

The special verdict submitted to the jury contained questions with respect to Nelson's negligence as to lookout, management and control, and speed, together with causation in such respects; and the jury answered all such questions "Yes." The verdict also inquired as to June Hamm's negligence with respect to lookout, management and control, and signaling a left turn, and the corresponding causation; and the jury found her causally negligent in only one respect, that of lookout. Further questions as to whether the plaintiff Romberg assumed the risk of Nelson's negligent operation were answered "No." Damages of the plaintiff were assessed by the jury at $8,889.

Appellants had requested submission of the question whether the plaintiff was negligent as to lookout and a comparative-negligence question between June Hamm and Romberg. The trial court refused to submit them. Appellants contend this was error.

The rule is discussed as follows in *Vandenack v. Crosby* (1957), 275 Wis. 421, 434, 82 N. W. (2d) 307:

"In *Goehmann v. National Biscuit Co.* (1931), 204 Wis. 427, 429, 235 N. W. 792, this court held that it is a general rule that passengers in an automobile must exercise due care for their own safety, and that this requires that they keep a proper lookout to warn the driver of approaching danger. [Citing cases.] A guest is not held to the same degree of care with respect to lookout that is required of the driver, and one sitting in the rear seat is held to a lesser degree of care than one sitting in the front seat. . . . In almost all instances the issue of the contributory negligence of a guest is for the jury to determine."

Further discussing the duty of passengers as to lookout, this court said in *Lewis v. Leiterman* (1958), 4 Wis. (2d) 592, 598, 91 N. W. (2d) 89:

"Just where their lesser duty excuses them from giving' timely warning of what their lesser duty requires them to see cannot be exactly stated. It depends on circumstances and is usually a jury question."

On cross-examination of the plaintiff with respect to his testimony on an adverse examination, there was evidence, taking the view most favorable to the appellants, that Romberg first saw the Hamm car when it was as little as 200 feet ahead, whereas he could have seen it almost 1,000 feet away, and that he "didn't pay no attention to it."

As to Nelson's management and speed, George Hamm, who talked to Nelson at the scene of the accident, testified:

"*A.* Well, I asked him, I says, 'How in the world did this happen?' and he says, 'I don't know; I was monkeying with my radio, and I looked up and the turn lights was on and it was too late to avoid the accident.' . . .

"*A.* Yes, Mr. Nelson was talking to Brookshaw, Max Brookshaw, the officer, and he asked how fast he was going, and Nelson says, 'Sixty-five miles an hour,' and I said, 'In order for you to smash that car that way . . . you would

have to be going faster than that,' and he says, 'Yes, I don't know how fast I was going.' "

Mr. Hamm further testified that he visited the plaintiff in the hospital following the accident—

"*Q.* And did Mr. Romberg at any time say anything with regard to the speed of the vehicle he was riding in? . . . *A.* He said, 'When we were on the new highway [Highway 53] we were going at a hundred miles an hour,' and he says, 'I feel sure we were going eighty when we hit her.' "

Mrs. Betty Olsen, an employee at the Cheese House, testified that she also visited Romberg in the hospital the day after the accident and asked him how fast they were going when the accident happened and Romberg replied, "Ninety miles when they hit."

On the basis of the evidence referred to, the excessive speed had continued for a considerable period of time before the collision occurred, and plaintiff exercising any care for his own safety would be required to keep a sharper lookout than he would have had the speed been less. Furthermore, there is no question but that had plaintiff been keeping a proper lookout he would not only have seen the Hamm car from as great a distance as 1,000 feet, but would also have observed that Nelson's attention was being diverted by "monkeying with the radio" while they were fast overtaking the Hamm car. It was a jury question as to his duty to observe both the road ahead and his driver's actions, and whether, under the circumstances described, he would have known that something was required of him that he could not do unless he kept a proper lookout for his own safety.

Appellant's request for submission of the question of contributory negligence to the jury was made, of course, before the jury made its findings. In considering and denying the request the trial court said:

". . . it doesn't seem to me that those questions would be of assistance in determining the issues in this case or that

findings of negligence as distinguished from assumption of risk could be sustained as to the passenger."

What the jury might later find on the question of assumption of risk would in no way affect a determination of whether Romberg's contributory negligence was a question to be submitted. While assumption of risk would involve the consideration whether Romberg willingly proceeded in the face of known danger, that would be a matter separate and distinct from the question whether he maintained a proper lookout for his own safety. The court did not know at the time the request for this question was made that the jury would absolve the plaintiff of assumption of risk. And findings on assumption of risk would in no way decide the issue of contributory negligence which was clearly raised by the evidence referred to above.

Since there must be a new trial, it is unnecessary to discuss the evidence regarding June Hamm's negligence.

Appellants maintain that the damages awarded to the plaintiff are excessive. The evidence shows that Romberg sustained a mild brain concussion, causing headaches over a thirteen-month period; many lacerations to the head and face, one of which was a gouged-out laceration of the left cheek leaving a bad scar; lacerations of the legs and arms; the fracture of two ribs and a punctured lung. The lung puncture resulted in the thickening of the pleura, a permanent condition which causes pain on deep breathing or exertion. The medical evidence also shows that the rib fractures further resulted in an involvement of an intercostal nerve causing pain in the chest. To reduce this pain an operation is necessary and recommended, an operation which would cost over $1,000 and cause a total disability of three to four months. Plaintiff testified he intends to undergo this surgery.

Romberg could do no work for four months and no heavy work for seven or eight months. His earnings from various heavy-type jobs before the accident were between $1.15

and $2.15 per hour. The disability which will result from the future surgery will cause additional loss of earnings.

With this evidence in the record, damages of $8,889 must be held to be reasonable. We find no indication of passion or prejudice, nor do the appellants point any out to us.

The rule was recently reiterated in *Sennott v. Seeber* (1959), 6 Wis. (2d) 590, 594, 95 N. W. (2d) 269, as follows:

" 'In actions sounding in damages merely, where the law furnishes no legal rule for measuring them, the amount to be awarded rests largely in the discretion of the jury, and with their verdict the courts are reluctant to interfere. As shown elsewhere, a verdict may be set aside as excessive by the trial court or on appeal when, and not unless, it is so clearly excessive as to indicate that it was the result of passion, prejudice, or corruption, or it is clear that the jury disregarded the evidence or the rules of law.' "

The trial court permitted the award of $8,889 to stand and in our opinion the evidence warrants it.

*By the Court.*—Order and judgment reversed, and cause remanded for a new trial on all issues except damages.